Good morning, your honors, counsel, and may it please the court. My name is Michael Gomez on behalf of Matthew Taylor Coleman, and I'd like to reserve five minutes for rebuttal. The district court here took the extraordinary step of ordering Mr. Coleman to be involuntarily medicated. Given the significance of this constitutional intrusion, the liberty interests at stake, and the high risk of error in this context, courts have set up simple yet crucial safeguards to ensure a defendant's due process rights are not sacrificed. Courts are required to make explicit specific factual findings and resolve disputes between disagreeing experts. The district court here did not do any of that. Instead, it issued the most cursory cell order I've encountered, and certainly more succinct than any case cited in our or the government's briefs. Any one of those three errors is enough to vacate the cell order in this case. And I'd like to take those, or address those three individual errors one by one. So as cell stated, the Supreme Court stated in cell, the second prong of the cell, or the second factor of the four-factor test, requires the district court to make two independent factual findings. So one, that the proposed medication is substantially likely to restore the defendant's competency. And two, that the medication is substantially unlikely to cause side effects that would interfere with his rights to a fair trial and his rights to, or his assistance of counsel. Now, the side effects issue isn't in this. You argued it some in your briefs, but you said unequivocally in the district court that you weren't arguing it. Is that right? No, there was not an unequivocal. There was no waiver of this issue in the district court, and there was no unequivocal giving up of any argument in this context. Not the side effects question? Not the side effects question, Your Honor. What Your Honor may be referring to was defense counsel's comments that the prior administration of Haldol given to Mr. Coleman in an emergency situation did not cause him physical side effects. Go ahead. I'll find it. But it did not cause him physical side effects, but it did not indicate at all that he would be restored to competency. To the extent that this particular factor, the second prong of the second cell factor, was not given a full-throated argument by defense counsel, it does not relieve the court from its obligation to make that factual finding that was set forth in cell and in this court's prior decision in United States v. Ruiz-Garciola. But turning to the first prong of the cell's second factor, the court had defined that the medication was substantially likely to restore Mr. Coleman's competency. There is no specific factual finding in the record on that. At most, the court gave a list of the generic categories of information considered in finding that this medication was more likely to restore him to competency. But there was — it lacks — the cell ruling lacks the level of detail, the particularized findings, particularized to Mr. Coleman's specific condition that this court and the Constitution require to justify a cell order. So, I mean, we presume that the district court understands what the law is. Yes. Right? And the court sort of — so, I mean, the court did not expressly describe in any detail what the — what the standard is under cell, but it said it was considering the cell factors. And it said that it thought that this factor was met. So, I mean, I guess the question is, we don't treat the district court like an administrative agency where we say that, you know, it has to say certain magic words. I mean, shouldn't we presume that, you know, given its reference to the standard, its determination that the standard was met, that the sort of subsidiary factual findings are the findings that it was making? In other contexts, perhaps that may be the case, but in this context, it's not. As this court stated in Ruiz-Garciola, there is a compelling need for such findings in this context so that the defendant may be assured that the district court has conducted the stringent review mandated in light of the substantial infringement on his liberty interests, and so that upon review, the appellate court may determine whether the findings are supported by clear and convincing evidence. So, this court's review of those findings and of the cell ruling is hindered because the record was not made at all in the district court's ruling. And if we look into the record itself, the court's finding that this medication, which, again, is only more likely to restore his competency, is not borne out by the record. It's clearly erroneous. So first, I'd like to mention that no BOP doctor, none of the government's three BOP doctors said at all that this medication is substantially likely to restore Mr. Coleman's  At most, Dr. Grady wrote in his treatment plan that the effects of Haldol would be, quote, a decrease in his symptoms of mental illness and an increase in functioning. That's the most that can be said. We go to the next level, the generalized evidence that the government relies on. That did not appear in Dr. Grady's treatment plan, in the report he wrote. That appeared in Appendix A to his treatment plan, which is a generic appendix that is attached to basically every cell proposal. And in that, once we delve a little deeper and look at those generalized statistics, we have studies show that 81% and 79% effective rate of competency restoration in the studies that were put forth in that appendix. So the government, I understand the intuitive force of the government's argument that, okay, we have this medication that's been approved by the FDA to treat psychotic disorders and delusional disorders for decades, so it's been effective for other people. Mr. Coleman has some of that, so it'll be effective for him. Was the study that, the studies that Grady relied on, were they involuntary administrations of medication? I believe they were involuntary medications. They were, or some of them were? Yes. I'm not exactly sure. The problem with those is that there's no real level of detail as to what particular psychotic disorders the defendants had. And it even covered many different types of antipsychotic medications, not just Haldol. But the point being that because it may have had an effective rate, an effective competency restoration rate of 81% and 79%, but there's still about 20% of defendants who were not restored to competency. What is the standard for competency here? The standard for competency? Yeah. It's the ability, I would say the standard for competency is the ability of the defendant to be able to meaningfully participate in his defense, to understand the proceedings, understand the charges against him, and be able to make rational decisions for himself to protect his fair trial rights. I mean, in U.S. v. Hernandez, we said competency restoration seeks only some minimal understanding of the proceedings and nothing more. I mean, I'm not certain, I mean, we make a distinction between restore functioning and competency to stand trial. This sounds like a very low standard for competency. It may be a low standard. I will say that in the cell context, the point is the protection of the defendant's due process rights and his rights to a fair trial. So if the defendant cannot participate in his trial in any meaningful way, if he cannot make those crucial decisions that are attended in every fair trial right, such as the decision whether to testify. I'd like to also point out... But isn't the, more than being a narrow or a higher or lower standard than restoration to functioning in general, it's a specific standard, it's a cognitive standard, right? So it could be that you could, you know, function, well, he did function in a sense that he took care of himself and so on. He wasn't non-functional, he wasn't violent, but he wasn't coherent. And so you might restore him to competency, could be harder than or different than restoring him to other functioning. Correct, Your Honor. And I'd like to point out the reason Mr. Coleman was found incompetent, and it was his delusions. So the delusions will affect and do affect his ability to perceive the proceedings, ability to understand. There are indications in the record that he believed his children would be resurrected. So he still believes that there are these things that could happen, and then when a certain date passes and they aren't resurrected, he becomes extremely emotional. He formerly had a great relationship with a defense attorney because he believed that she was also a believer in what he said. But then that relationship was ruined when he thought that she was collaborating with the government. So these delusions are the reasons that he was deemed incompetent, the reasons that the attorney-client relationship has broken. And Justice Kennedy wrote in his concurrence in Riggins v. Nevada all the different ways that antipsychotic medication can affect an individual's fair trial rights. And all of those would be affected in this case. I'd like to go back to the effectiveness of the generalized evidence because the government On that point, what about, I mean, the defense expert, Dr. Morris, said that if Mr. Coleman were his patient, he would encourage him to try this. So I'm having trouble reconciling that claim from Dr. Morris with the idea that there's no substantial likelihood that this would be effective. Yes, Your Honor. Dr. Morris identified several factors or several facets of Mr. Coleman's particular condition that made it less likely that he would be restored to competency. So what Dr. Morris said, if he were his patient, he would try antipsychotic medication, he would try Haldol. That's for a patient who is voluntarily coming to him, believes something is wrong, and needs help. And as Dr. Morris said, studies have shown that when an individual is voluntarily seeking help, the Haldol, an antipsychotic medication, is more likely to work for that person. However, Dr. Morris said in this case, one, Mr. Coleman is not voluntarily seeking treatment. He's delusional and doesn't think there's anything wrong. Two, the duration of his undiagnosed psychosis makes it less likely that he would respond positively to Haldol. That's a factor that I'm wondering if the court weighed heavily enough, because it doesn't seem to weigh into the analysis. What specifically do we have in the record about the impact of the lengthy duration on the ability to be restored to competency? Well, Dr. Morris wrote about it in his report and cited studies that showing that the lengthy duration of undiagnosed psychosis and also the severity and intensity of delusions is what makes it less likely for those delusions to be lessened or even just eliminated by a medication. There were several serious studies that were in the record, as I understand it. Yes, there were. And these talk about clinical outcomes, which was another point of contention, whether it's clinical outcome or competency restoration. But the clinical outcomes, they go hand in hand. It's not two things that could be parsed out. The clinical outcomes in those studies show that when you do have a longer duration of undiagnosed psychosis, when you do have severe and intense delusions, when you do have a who is involuntary, whose delusions are involuntary and is not voluntarily seeking treatment, all of those show that the delusions will not wane. They will not be lessened. Here, the delusions are the source of the incompetency. What did the district court say about Dr. Morris's opinions? Did you make any findings about it at all? No, Your Honor. And that is a different error that the court made, is that there were these two competing experts. There were disagreements between them as to the likelihood of restoration, on the one hand, generalized evidence, and on the other hand, specific factors about Mr. Coleman's condition. And Dr. Morris put those. That report was attached to the government's opposition, and the government, in reply, did not address the report, other than to say he didn't meet with them, with Mr. Coleman, but did not attach a supplemental report by Dr. Grady. So those, Dr. Morris's report- Dr. Grady didn't meet with him either, though. He tried, but he wasn't able to. Correct, Your Honor. So neither of them met with him. Right. No one met with Mr. Coleman. And Dr. Grady did not rebut Mr. Coleman's report at all. The government didn't report it. So the district court had an obligation to resolve those disagreements. The district court never discredited Dr. Morris, never said, I find him not credible, I find his opinion unreliable. It was just that the district court engaged in a colloquy with defense counsel about Dr. Morris's opinion, and then just sided with the government with no explanation. So I mean, if the district court had added a sentence that said, you know, having considered both Dr. Grady and Dr. Morris, I find Dr. Grady's opinion to be better reasoned and more persuasive, I mean, you would still say that that was clear error, I take it. But would that satisfy your objection to the adequacy of the explanation? No, Your Honor. I would say it's not only clear error, but a procedural error in failing to resolve those differences. But I guess in my hypothetical, like, we have a statement that having considered them both, I think the one is more persuasive than the other. That's not enough. There has to be, what more does there have to be? Yes, Your Honor. And I'd like to point to the government's own case that it cited, and I believe it was United States v. Deere in the Tenth Circuit, where the defendant complained there were two competing experts. The Tenth Circuit chose one expert, and in a written order, explained why the government's expert was more credible. The defendant argued that there should have been a more, or should have addressed the defense expert's conclusions as well. And the Tenth Circuit said, no, it didn't need to, because there was sufficient explanation for the government expert's opinion that we could infer the reasons the court did not agree with the defense expert. Here, we don't have any reasons whatsoever. Well, here we don't. As you pointed out, from Dr. Grady, we don't actually have a finding as to competence. Correct, Your Honor. We don't have a finding as to competency. We just have a finding as to treatment and a decrease in symptoms, and an increase in functioning without any further explanation. And the court certainly did not supplement that one sentence with any explanation as to why that should be credited over Dr. Morris's. The district judge's ultimate conclusion was that it's more likely than not that this will help move him to competency. So she didn't find that it was more likely than not, or clear and convincing evidence, or however all those pieces fit together, which, to make him competent. Correct, Your Honor. She did not make that finding at all. I see that I'm running out of time, so if the court has no further questions, I'll reserve the remaining time. Let me just say one thing. I mean, you did say in the district court that that is a different cell factor with regard to these terrible side effects. It's a different cell factor, and we're not arguing that cell factor. Yes, Your Honor. That was in reference to the fourth cell factor, whether a medication is medically appropriate that looks to harm, whether the medication would harm or cause physical side effects. So counsel was not referring to the second prong. It's not so obvious that that wasn't. Yeah, but that's a, there's the two, I guess, to clarify. Are you arguing that, because there isn't any actual evidence from Dr. Morris about the kind of side effects that Justice Kennedy was talking about, or any other for that matter. Not specifically. That was the, I guess, the majority of the arguments here were on the first prong, so I'll admit that. But the second prong, the side effects, were before the court. It takes up about maybe three to five pages in Appendix A, the different side effects that could occur with the administration of Haldol. So that's all within the record, and again, the court is obligated to make that finding. And that's a clearly established law, so to the extent the court does review this for plain error, we do believe that it does constitute plain error. And with that, I'll reserve the remainder of my time for rebuttal. Thank you. Good morning. May it please the court, Zach Howell on behalf of the United States. Four doctors in this case agreed that antipsychotic medication was medically appropriate and would help Coleman. The only question... Would help him do what? Would help him... I mean, Dr. Crady did not make a finding that it would help him become competent, did he? Yes. Where? He said it was a necessity for the restoration of his competence. He says that on page 1507. And then at page 1518 through 1520 of the record, he says that Haloperidol is an excellent treatment that will reduce his mental illness and that will increase his functioning. He also says that his condition requires treatment, and then he attached documents to his report showing the overwhelming success of medications at treating conditions just like the one that Coleman suffers from. And one of your questions was, do those studies actually deal with involuntary medication? The answer is yes. I just looked at them. I'm not sure they do. I mean, not specifically. I'll give you the title of the main article that was cited. It is, Involuntary Medication Treatment is a Clear and Convincing Success. So I think it says very plainly that they're focusing on involuntary medication under cell and analyzing the effects of that medication. And across the board, it was demonstrated to be overwhelmingly effective at conditions like the one that Coleman suffers from. He was diagnosed with being on the unspecified schizophrenia spectrum. The studies show about a 76% rate of restoration for schizophrenia. And then he also was in kind of this sort of catch-all category. On the catch-all category, the Cochran article says that psychosis not otherwise specified had about a 93% success rate of restoration. So again, I think both the specific findings of Dr. Grady and the studies he's citing show an overwhelming success rate. I think it would be hard to read that as anything other than a conclusion that this medication is substantially likely to restore him to confidence. The standard the district court kept reciting was more likely than not. And that is not the case law. So how do you reconcile that? Sure. So let me break it out because I think it's important to separate the burden of proof from the confidence interval. I absolutely agree. The burden of proof is clear and convincing evidence. That's what the government has to show all four cell factors. Clear and convincing that it is substantially likely that he would be restored to confidence to stand trial. Right. And so substantial likelihood. That would be the confidence interval. Now, on the burden of proof, the court is applying clear and convincing evidence. It says at page 35, the standard here is clear and convincing evidence. Yeah, but she said a lot of things. Like at one point in the record, she says, I'm at a loss. I don't know what to do. She also said that the two things merged together. She doesn't see a difference between them. And I'm happy to address the at-a-loss comment, but just so that I can close the loop on... I mean, she did say a lot of different things during the course of this thing and when she made her final findings, she didn't recite substantial likelihood or clear and convincing. Although I agree that at the beginning, she seemed to allude to that. But I don't know. These findings are less than satisfactory to know that she was really making those findings that are required. I agree with you that on the confidence interval, the substantial likelihood, she is defining that as more likely than not. So I do think it's clear what she's doing. She's saying it's clear and convincing evidence that it is more likely than not to restore competency. The only question is, was she correct that it's a more likely than not standard? Now, I think that's on plain error review. There was never an objection to the more likely than not standard. In fact, when the court alluded to a more likely than not standard at page 27 and 28 of the record, Coleman's counsel says, I agree with everything the court said. So assuming there's no waiver, we are at most on plain error review. And there's a split in the courts on what's the standard. She said the standard here is clear and convincing evidence that this is going to be more likely. Again, that's such a blended thing. So she didn't seem to think that it was sort of saying the same thing twice, which I thought reading the standard maybe is true, but it's confusing. But she was not separating them out. But more than that, where did she actually find that it was more likely than not that he would – that there was clear and convincing evidence that he – that it was more likely than not that he would – this would restore him to competence? At page 40 and 41 of the record. On page 40, she says they have proved it is more likely than not that this would help move him to competency. That's correct. Well, it says help move him, but it doesn't say it would make him competent. I think it's hard to read that as anything other than a finding that it's going to be more likely than not make him competent. I think what the problem is, is that Dr. Grady is saying that this is a necessity. He's not saying necessarily that this particular drug will restore his competence to stand trial. But what he is saying is that it's necessary to administer this or something like this because of his delusional mental illness. That it's – we don't know if it will – this is how I'm reading it. We don't know for sure if it will restore him to competency. But he needs to have this treatment first before we can even get to a point where we know he can be restored to competency. Your Honor, I don't read it that way. Right before Dr. Grady says that this is a necessity to restore him to competency, he says a court order is necessary via cell. So he's referencing cell itself and then saying this is a necessity to restore him to competency. He's not a lawyer. He's a doctor. And I think that's probably why he's not – When you say it's a necessity of medication, what he said is the necessity of medication for Mr. Coleman's restoration of competency. There is a confusion throughout this between whether there is a – whether he will do better with the medication than without it or whether he will actually be restored to competency with it. And it seems to me that he was talking about the first and not the second. He was saying, well, if he's going to be restored to competency, he needs medication. But he wasn't saying that he was going to be restored to competency if he had medication. Your Honor, I don't agree with that reading of the report. Again, I think it's part – The necessity of medication for Mr. Coleman's restoration of competency. That's what he said. Yes, and then he says at page 15, 19, and 20 that he requires medication, that this is an excellent medication, that it's going to reduce his mental illness, that it's going to increase his functioning. And then he says he's attaching appendices and he attaches those appendices showing the overwhelming success rate of these medications. As I said, the title of the article he's relying on is that involuntary medication is a clear and convincing success. It's hard to read, Your Honor. I mean, the real problem is that in almost every other instance the district judge has written, you know, a substantial and considered opinion that we can work with. And here we have a lot of stray remarks as part of the problem in terms of whether – what the district court made of all this. I mean, I'm – because that's really the question. I agree with that. And we really don't know. I agree that's the question, Your Honor. I think the statement from the court that the evidence, analysis, records, case law, scientific data all prove that the involuntary medication will significantly advance the interests in the case is a pretty clear finding on the second cell factor. Not really. It's not very clear at all. It's significantly advanced. It doesn't say he's going to be restored to competence. Your Honor, the second cell factor, the definition of what the court has just said includes both two of those subparts, one of which is that it is significantly likely to restore him to competence. As Judge Miller said, the court is presumed to know the law. And so when it outright says, here is my finding, quoting verbatim, cell factor two, it's assumed that that includes both subparts of cell factor two. But again, the court also does have that specific finding at page 40 where it says this is more likely than not to help restore him to competency. No, she didn't say that. She said it's more likely than not to help move him toward competency. Again, I think we're maybe looking for magic words. It's hard for me to read that as anything other than the court saying that will restore him to competency more likely than not. The only question is, is more likely than not the right standard. And can I ask, what do you make of our decision in Ruiz-Garriola, which seems to suggest that the normal mode of analysis where we sort of assume that the district court made the necessary subsidiary findings given its legal conclusion maybe isn't appropriate here and that there is a sort of heightened requirement that the district court expressly articulate the findings that support the determination? Your Honor, I don't read it as applying any sort of heightened finding requirements. It's certainly true that it is important that the court make findings that allow this court to determine that the district court has, in fact, made a reasoned finding on the various cell factors. The problem in Ruiz-Garriola is that those findings weren't present, and to the extent that they were, they were entirely undermined by the record. There, you did not have doctors who were in agreement on a medication and whether it would be helpful or not, nor did you have an expert who was citing studies that actually supported the use of the medication or anything like that. The court said that the government's expert was less experienced, hadn't cited any studies, hadn't provided the proper rationale, whereas the defense expert was far more experienced, was citing far better studies, and so on. Here, you don't have that. I think everyone... Well, but I mean, here we have conflicting expert testimony and we can infer which one the district court must have preferred, but we don't really know why, right? I think you do know why, Your Honor, and let me try and sort of broaden the scope here because this court has always looked to the record as a whole. It doesn't just look at sort of the one page where the court says, I hereby find. Throughout the course of the proceeding, the court is actively engaged, and I think it's very easy to see why the court is rejecting Dr. Morris's report and accepting the government's. So if you look at page 25 and 26, the court describes Dr. Morris's report, and then there's an active discussion at page 29 through 36 of the record where the court is engaging with Dr. Morris's report, and it is drawing this distinction... What page is that again? 29 through 36, and I'll walk through it, but the court is engaging with this notion that there is a difference between competency and prognosis or making Coleman entirely better, and so when you have defense counsel citing Dr. Morris's report and saying we're talking about making him better, the court interjects at page 32 of the record and says, is there a difference the court should consider in making him better and restoring competency? And then it hits on that point throughout the rest of that transcript. And the answer is yes, he should be making the distinction. That's absolutely right, and the government picks up on that point. It says the point is substantially likely to make him competent for trial. It's not to make him better, and I think that's the disconnect in Dr. Morris's report. That's at page 33 of the record. Well, it's actually not. He had some of his cited articles for specifically about competency. And to the extent they were, they actually undermined his position, Your Honor. The government quoted from those articles at page 34 and 37 of the record, and what that article showed, the gay article, was that it's difficult for examiners, and I'm quoting, to parse out symptoms related to competency restoration due to the high base rate, i.e., 75% to 95% of successful restorability. Dr. Morris makes the exact same point in his report at page 1524. So the reason that there wasn't a rebuttal report is because Dr. Grady has already basically pre-butted the studies that Dr. Morris is relying on. He's making the point that you can't rely on duration of untreated psychosis because the rate of restoration is so high that duration of untreated psychosis doesn't actually show anything about the ability to restore competency. But to go back to the point... I didn't say it doesn't show it. It just can't be shown statistically because the numbers are small. That's what I interested him to be saying. But the district judge said that... I mean, her discussion of Dr. Morris's report was actually quite short. Most of the pages that you're talking about was Ms. O'Connor talking. And she... What page was it again that you were talking about? So I was on 33 and 34. If I could go to 35 and 36, that's where the court actually picks up on the government's points. So directly after the government is making these arguments about how Dr. Morris's report isn't focused on competency, the court then says, it's a problem for the court that these medical records and reports that people are referring to aren't really focused on that, that being competency, as opposed to how do you cure someone. So I think that's a pretty clear reference to Dr. Morris's report, which isn't focused on competency. Then the court says, referring to the government's doctors, I have one set of doctors who are seeing him, working with him, talking to him, who have seen this medication has worked for him in the past. They're opining, yes, if we medicate him, it is more likely we can get him, based on statistical numbers, to be able to communicate with his counsel and work on his defense. In other words, to be competent. Defense counsel is saying that's not... I think you're putting words in the judge's mouth. But, I mean, that's another problem when she relies on it's helped in the past. He took it one time in the past. So how can she make such... rely on such a generalized statement that it's worked in the past? One time, and what it worked to do was to sedate him. It did not work to restore his competency. I don't think that's correct, Your Honor. So I think defense counsel... It also wasn't only one drug. It was several different drugs he took at that time. There were four different drugs in combination. And only one was the antipsychotic. That was the haloperidol. On the sedation issue, defense counsel conceded below at page 37 and 38 of the record that it was the Benadryl that sedated him. So that's not a harmful side effect that's going to... that the haloperidol is going to cause. Dr. Morris doesn't even focus on that. But then on the question of what the prior treatment with haloperidol actually did, I think you can look at the doctor's and the nurse's descriptions as well as Coleman's own description of how that medication affected him. The doctors and nurses, page 1400, 1472-74, and 1476 of the record, they describe him as alert, oriented, alert and cooperative, much improved. And then Coleman himself at page 1502 in a call to his wife says that he was pretty sick but that he was doing better now and doing good now. So certainly as at least one factor in why this treatment would be beneficial, I think the court is absolutely right to hit on that. But again, that's not the only factor the court noted. It's talking about the fact that the doctors, they saw him, they worked with him, they talked to him, they're looking at statistical numbers. And it's after all of those sentences that the court says, defense counsel is saying that's not good enough, I'm kind of at a loss here. There's really no other way to read that given what the court has just said than that it's at a loss at why those thorough efforts and those statistical numbers wouldn't be good enough. But they therefore would be good enough for anyone. I mean the real problem here is whether there is some individualization that's required which is what our case law seems to say. And she kept saying, well this is a matter of statistics. And you're saying it's a matter of statistics. So those same studies could be attached to any competency finding or any finding about restoration of competency and that would be the end of the story. Not necessarily, Your Honor. I think you could have situations where you might have that rare variety of delusional disorder. You know, the grandiose type or the persecution type that is especially resistant to treatment. Or you could have a defendant who has taken medication in the past and it has actually caused problems or hasn't worked. You can have situations where it's not going to work. This just wasn't that. And again, I do think it's important to focus on the points of agreement Or the studies and I don't know the answer to this. The studies that Dr. Grady pointed to specifically about schizophrenia. Yes. It breaks some of them out at page 1524. So again, schizophrenia, the success rate was 76%. And then for the catch-all unspecified psychotic disorders it was about 93%. And then for schizophrenia with a mood disorder, so schizoaffective disorder, it was about 82%. So all of the disorders that would be close to what Coleman has, again, showed an overwhelming success rate. And I should note haloperidol was the most commonly used medication in that study. And the government pointed that out. It's at page 1275. That's the government's briefing below. It points out that haloperidol was the most commonly used medication. So both the condition and the medication I think were specifically tailored. And then you add to that the fact that Coleman has used this in the past and that Dr. Grady considered all of that. But what about I mean the main issue that your opponent is saying wasn't taken into account is the question of the length of his psychosis. How long had it been going on? Right, Your Honor. So I think it was taken into account. Where? In fact, at page 30, defense counsel in the court below even says that they did account for his duration of untreated psychosis. They just don't agree with the conclusions that were drawn about it. But again, I don't think it was clear error for the courts not to credit Dr. Morris's untreated duration. I'm sorry. The defense counsel said it but Dr. Grady's analysis took no account of it and the judge took no account of it. I don't think that's correct, Your Honor. So at page 1519 and 1518 of the record, Dr. Morris has a very nuanced analysis of the duration of untreated psychosis. Dr. Morris or Dr. Grady? Excuse me, Dr. Grady. He says that he believes that the psychosis is longstanding but that he believed the baseline was not mental psychosis until about 2023 and that prior to that he was having these severe episodes based on all of the material he's reviewed. So he actually does account for it. He has a pretty nuanced analysis of it and yet he still says haloperidol is an excellent treatment. But he doesn't factor it into his... Well, first of all, what page did you say it was on? I believe it's 1518 and 1519 of the record. There's a big bullet point one, two, three where he sort of walks through some of the past incidents and draws these conclusions about the baseline flipping from being normal functioning with mental lapses and then the baseline being the mental psychosis a couple years back. So, again, he does talk all about the long duration of the condition It's not something that he overlooked. But the problem is that that doesn't relate to competency restoration. And, in fact... Well, but Morris says it does. That's the dispute that the district judge did not acknowledge and did not resolve. I think the discussion I've just quoted, page 29 through 36 where the court specifically addresses the difference between competency and a cure and is it all         in response to a discussion of Dr. Morris's report and then says it's crediting the government's doctors who have met with him and etc. It seems pretty clear the court is rejecting Dr. Morris's report other than saying... But she never... His main point was that you have to take his history into account and he had looked... Although Dr. Grady said he... What he really said in that part where you were talking about is we really don't know his history because he won't talk to us pretty much is what he said. But Dr. Morris had found some more by reading some of his journals and had... He thought a clear idea of his history and none of that is in the district court's recognition about which person to... Which expert to credit. So, Your Honor, I think the pages I've quoted are reasonably read that way but what I can say is even if you...  I'm sorry, Your Honor. I think the pages       show me where that's the case. I just don't see... Does she say anywhere that Dr. Morris says that we should be taking into account his long history and Dr. Grady...  And for some reason I don't think that's true? No. Nowhere. I think the two best places I can point you to are at page 35 and 36 where the court says it's a problem for the court that you have one set of doctors relying on studies about how to cure       someone and then says I have another set of doctors who are meeting with him looking at statistical data talking to him taking account of his past treatment I'm at a loss for what defense counsel says that's not good enough I'm at a loss. And then of course at page 40 when the court expressly finds that the government proved through the statistics through the case law through the various different factors that it listed off that the second factor was met I think that's more than enough to encompass that finding and even if it wasn't as explicit But she says all of this is going to be statistical which is really saying we're not going to look at the specifics of the person I don't think that's right I think what she's saying is it's statistical the chance of success you're ultimately going to have to look at statistics related to the medication success rate which I think is absolutely true I think it's important to cite all of the studies that Dr. Moore cited But I don't think when she's saying they've met with him they've looked at his past use of medication they've talked to him The court is clearly placing weight on the fact that these doctors actually did all of this robust analysis of him specifically But not with regard to his past history of psychosis I believe so Your Honor And not with any recognition that that matters I see Again I think the rejection of Dr. Moore's report which she views as focusing on curing him rather than competency would encompass that And if you want a case for support I do think the Deere case from the Tenth Circuit is a good one There the specific argument was that the court failed to address duration of untreated psychosis And the Tenth Circuit said that is true But the court did say it was crediting an expert based on their experience and having met with the defendant And that was enough to infer that they were rejecting this notion of duration of untreated psychosis And if I could just make one last point I know I'm a little over time here But if you really wanted to credit this duration of untreated psychosis analysis I think you would have to conclude that there could never be a cell order Because the duration of untreated psychosis that is defined as excessive is a year or more And in some cases four weeks or more But as this case shows and as every case you can look at that we've cited shows it takes longer than a year just to get to the point of being able to issue the cell order But our question here isn't whether there could be a cell order with an adequate analysis The question is whether the district court really looked at all the pieces before she came to her conclusion And I think the answer is yes The district court cites all of the cell factors it quotes them page 25 and 26 of the record it then discusses Dr. Morris's report specifically it describes his report specifically All she says about it is negative because she says he said that he would recommend it if it was his patient and it would be more likely than other things to restore him both of which are not pertinent to the question And that's basically what she said about Dr. Morris Again I don't agree that's the sum total of what the court said The fact that the court makes the point that it's focused on not on  but on how to cure someone that's the court recognizing the point the government has just made about the quote disconnect between Dr. Morris's report And this is getting very repetitive I think we can interpret what she's saying based on the record ourselves So if you want to sum up I'd appreciate that Absolutely Your Honor I would simply say that I think the court here should find that the  court made adequate findings and that it did not act illogically or implausibly in crediting the government's medical experts over the defendants Thank you counsel I'd like to begin by addressing the government's point about Dr. Grady stating that antipsychotic medication was a drug  an individual It's not a drug       a drug    individual It's  a drug for an individual Let me repeat Dr. Grady's        court's reasons for rejecting one expert's  over another is because the detailed written order showed the difference between the two experts and why the court found in favor of one as opposed to another. As your honors have seen, the government has been unable to point to anywhere in the record where the district court stated clearly its reasons for accepting Dr. Grady's opinion over Dr. Morris's. Here we have effectiveness rates. However, there's about 20% of defendants who were not restored to competency. The government assumes Mr.  would fall into the effective 70% or 80%. Dr. Morris identified at least three factors that would place Mr.  in the effective  or 80%. The government admitted this at the cell hearing. When you look at certain characteristics that he has, yeah, he fits into some of them that suggest maybe he is not as receptive to it. But he also fits some that suggest he probably is receptive to it. So we have even the government admitting there are particular facets of Mr. Coleman's condition that render him more unlikely to respond to Haldol and restoring his competency. So the government, not below and not here, has been able to point to anything in the record in its own briefing or in Dr. Grady's report or any other BOP report addressing those characteristics that placed Mr. Coleman in the unrestored camp. Piecing together random comments in a  hearing is not what           this court vacate the order or remand for further findings. Thank you. Both sides for an excellent argument. United States versus Coleman will be submitted.
judges: WARDLAW, BERZON, MILLER